|  |  |
|---|---|
| UNITED STATES OF AMERICA and ) <br> PEOPLE OF THE VIRGIN ISLANDS, ) <br> ) <br> v. ) <br> ) <br> RUSIEL "ROMEO" ENCARNACION, ) <br> FRANCISCO "CISCO" HASSELL III, and ) <br> EDWIN HENDRICKSON, JR., ) <br> ) <br> **Defendants.** ) | Criminal Action No. 2013-020 |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the United States and the Virgin Islands*

**Jomo Meade, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Rusiel Encarnacion*

**Emile A. Henderson, III, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Franciso Hassell III*

**Martial A. Webster, Esq.,**
St. Croix, U.S.V.I
    *For Defendant Edwin Hendrickson, Jr.*

## MEMORANDUM OPINION AND ORDER

**Lewis, Chief Judge**

    THIS MATTER comes before the Court on Defendant Edwin Hendrickson Jr.'s Motion to Suppress (Dkt. No. 17), Defendant Francisco Hassell III's Motion to Suppress (Dkt. No. 24),[1]

---
[1] Defendant Rusiel Encarnacion subsequently joined the Motions to Suppress. (Dkt. No. 30).

and the Government's Opposition to both Motions (Dkt. No. 23). An evidentiary hearing was held on Defendants' Motions on December 18, 2013. For the following reasons, the Court will deny Defendants' Motions.

## I. BACKGROUND AND EVIDENCE[2]

On September 26, 2013, the Government filed a twenty-one count Indictment charging Defendants with various violations of federal law related to two armed robberies they allegedly perpetrated in the early hours of January 13, 2013—one outside of the Cool Out Bar and the other on Hospital Street in St. Croix, Virgin Islands. (Dkt. No. 1). In their Motions to Suppress, Defendants seek to suppress all evidence obtained during an encounter with Virgin Islands Police Department ("VIPD") officers that day, on the grounds that such evidence was seized in violation of Defendants' Fourth Amendment rights. (*See* Dkt. Nos. 18, 24).[3]

At the evidentiary hearing held on December 18, 2013, the parties presented evidence and argument on Defendants' Motions to Suppress. VIPD Deputy Chief Arthur Hector and VIPD Officers Miguel Osorio, Jr. and Roger Roberts testified for the Government. Defendant Hassell testified for the defense.

---

[2] The Court bases the background factual discussion in this section on the filings submitted by the parties in connection with the Motions to Suppress and the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendants are presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[3] According to the Affidavit of Special Agent Thomas Calhoun, attached as Exhibit 1 to Defendant Hendrickson's Memorandum in Support of his Motion to Suppress, the search conducted by the police resulted in the seizure of "three loaded handguns—one with a serial number removed—each found inside the door panel where the defendants were sitting, magazines containing ammunition, approximately 100 grams of marijuana, a face mask, and stolen property from the victims of both the Cool Out Bar robbery and the Christiansted robbery." (Dkt. No. 18-1).

## A. The Government's Version of Events Preceding the Stop

The Government's version of the events preceding the stop of the vehicle in question—based on the testimony of Officers Osorio and Roberts and Deputy Chief Hector—can be summarized as follows.

Officer Osorio and his partner, identified as Officer Benitez, were dispatched to the vicinity of the Cool Out Bar at approximately 1:00 a.m. on January 13, 2013, in response to reported gunshots. Upon arrival, Officers Osorio and Benitez encountered three males who waved them down and informed the officers that they had just been robbed by three assailants. The victims of the robbery told the officers that the assailants had weapons and stole their belongings. The victims further informed the officers that the assailants were black males, dressed in all black, and driving a silver Toyota Corolla with a shiny chrome gas tank cover. One of the assailants had a tattoo of a cross on his face and was nicknamed "Romeo."

Officer Osorio relayed this information over the radio. He did not obtain a license plate number from the victims. According to Officer Osorio, an unspecified number of other officers arrived on the scene. Deputy Chief Hector testified that he was one of those other officers. He could not recall if he was told the license plate number on the scene or heard it on the radio shortly thereafter. Deputy Chief Hector left the scene to respond to an unrelated crime while Officers Osorio and Benitez, as well as other officers, were still on the scene. Thereafter, Officer Osorio escorted the victims to the Marshall Command Police Station where the victims filed a report with the same information they gave to Officer Osorio at the scene.

Officer Osorio further testified that while he was at Marshall Command, two victims from a robbery on Hospital Street arrived to report that they had been robbed by three black males driving a silver Toyota Corolla. Thereafter, one of the Cool Out Bar victims informed

Officer Osorio that he saw the Corolla involved in the robbery drive past Marshall Command heading west. Officer Osorio "radioed in the information to control," and left the station in his police car in pursuit of the Corolla.

Officer Roberts testified that he was out on patrol and heard a call over the radio reporting the robbery at the Cool Out Bar. According to Officer Roberts, the call stated that three men dressed in black and carrying guns committed a robbery and left in a silverish/goldish Corolla with a chrome gas tank cover. The call further stated that one of the assailants had a cross tattoo on his face. Officer Roberts also testified that he learned that the license plate number of the Corolla was "CEI 244," although his testimony regarding the source of this knowledge was not definitive.[4]

Both Officer Roberts and Deputy Chief Hector heard another call over the police radio reporting that one of the Cool Out Bar victims saw the Corolla drive past Marshall Command heading west. Officer Roberts, who was in the vicinity of the by-pass heading east, turned his car around and drove toward Centerline Road, hoping to intercept the Corolla. Between two and five minutes later, he spotted a silver Corolla and saw the license plate number "CEI 244." He followed the car for a few minutes to make sure it had the previously identified chrome gas tank cover and to find a safe location to pull it over. Officer Roberts put out a call over the radio that he was following the Corolla and intended to stop it at La Reine. Deputy Chief Hector heard this call. After observing the chrome gas tank cover[5] and reaching La Reine, Officer Roberts stopped

---

[4] Officer Roberts testified on direct examination that he heard the license plate number over the radio broadcast reporting the robbery. However, on cross-examination, he testified that he did not know whether he learned the license plate number from the radio broadcast, from one of the police officers that responded to the robbery at the Cool Out Bar, or from one of the police officers at Marshall Command.

[5] Officer Roberts testified that as he approached Sunny Isle Shopping Center, traveling

the Corolla. Officer Roberts put a call out over the radio that he had stopped the vehicle, which was heard by Officer Osorio.

**B.     The Government's Version of the Stop and Search**

Officer Roberts testified that after he stopped the Corolla, the driver, later identified as Defendant Hassell, came out of the vehicle. Officer Roberts, in turn, exited his vehicle and stood behind the door with his gun drawn and held at the "low ready" position—in his hand, but to his side at a vertical angle. He testified that he feared for his life because he believed these individuals had been involved in an armed robbery. Officer Roberts asked Defendant Hassell for his license, registration, and proof of insurance. Defendant Hassell asked Officer Roberts why he had stopped his vehicle. Officer Roberts informed Defendant Hassell that the Corolla matched the description of a vehicle involved in an incident earlier in the evening. Around this time, Deputy Chief Hector arrived on the scene. Deputy Chief Hector testified that when he arrived, Officer Roberts was standing outside of his vehicle, behind the door, and Defendant Hassell was outside of the Corolla. Deputy Chief Hector approached Office Roberts' vehicle, and upon reaching it, smelled marijuana coming from the Corolla.

Officer Roberts asked Defendant Hassell if there were other passengers in his car. When Defendant Hassell stated that there were two passengers, Officers Roberts asked Hassell to tell the passengers to exit the vehicle. Defendant Hassell did so and the passengers, later identified as Defendants Hendrickson and Encarnacion, came out of the Corolla. The three Defendants were

---

westbound, there were two cars between his vehicle and the Corolla. Before reaching the light at Sunny Isle, the two cars between Officer Roberts and the Corolla moved into the left lane, thus putting Officer Roberts directly behind the Corolla. Following Centerline Road as it turned northbound, the Corolla passed Barren Spot Mall with Officer Roberts behind. Officer Roberts testified that as the Corolla followed Centerline Road to the left, he slowed down, cut the corner sharply, turned his high beams on, and observed the chrome gas tank cover on the driver's side of the Corolla.

dressed in black. Officer Roberts smelled a strong odor of marijuana coming from Hassell's person and the Corolla and he so informed Defendant Hassell.[6] According to Officer Roberts, Defendant Hassell told him that he (Hassell) and his partners had been smoking marijuana earlier.[7]

Officer Roberts told the three Defendants that he was going to pat them down for his safety and theirs, and asked Defendant Hassell "if he minds if I search the vehicle," to which Hassell replied "no." Deputy Chief Hector, who was the only other member of VIPD on the scene at the time, testified that he witnessed Defendant Hassell consent to the search. Thereafter, Officers Osorio and Benitez arrived. Officer Osorio testified that, upon exiting his vehicle, he smelled marijuana coming from the Corolla. Additionally, Officer Osorio smelled marijuana coming from Defendant Hassell's person.

The Government's three witnesses provided differing accounts of how Defendants were handcuffed and ordered to the ground. Officer Roberts testified that he neither handcuffed Defendants nor ordered them to the ground. Deputy Chief Hector testified that he did not handcuff Defendants; that he did not know who handcuffed them; and that Officer Roberts ordered Defendants to the ground. Officer Osorio testified that when he arrived he assisted Officer Roberts and Deputy Chief Hector in handcuffing Defendants. Specifically, Officer Osorio testified that he handcuffed Defendant Hassell.[8]

---

[6] On cross-examination, Officer Roberts testified that he could not identify whether the marijuana odor that he smelled was from burnt or unburnt marijuana.

[7] On cross-examination, Officer Roberts acknowledged that he did not include this fact in his report.

[8] During direct examination, Officer Osorio testified that he assisted in handcuffing Defendants and then the officers sat Defendants down on the ground. However, on cross-examination, Officer Osorio answered in the affirmative to the questions: "these three Defendants were already all on the ground when you got there?" and "when you got to the scene they were all on

Shortly thereafter, an officer identified as Officer Hodge arrived on the scene. Officers Roberts, Benitez, and Hodge searched the Corolla.[9] Early in the search, Officer Roberts observed a brown paper bag hidden behind the air vent in the front passenger side of the Corolla. He removed the vent cover, removed the brown paper bag, and therein found an empty chrome magazine. During the remainder of the search, the officers removed door panels, the radio, and the glove compartment. In addition to the empty chrome magazine, the officers found three handguns; what appeared to be a partially smoked marijuana cigarette; three sandwich bags containing what appeared to be marijuana; and jewelry, a face mask, cell phones, and a music player resembling a phone.[10] Some of the recovered property belonged to the victims of the two robberies.

## C.  Defendant's Version of the Stop and Search

Defendant Hassell, who was driving the Corolla when Officer Roberts stopped the vehicle, provided a different version of the stop and search in his testimony. Defendant Hassell testified that, after pulling over the Corolla, Officer Roberts remained in his vehicle and instructed Defendant Hassell to exit the Corolla and approach Officer Roberts' vehicle with his license and registration. According to Defendant Hassell, Officer Roberts remained seated in his car with the door closed and the window open as Defendant Hassell brought him the documents. Defendant Hassell testified that he asked Officer Roberts why he had pulled him over, but Officer Roberts did not provide a reason. Instead, Officer Roberts asked if there were other

---

the ground, facedown?"

[9] Officer Osorio testified that he did not participate in the search, but Officer Roberts and Deputy Chief Hector both testified that Officer Osorio did participate.

[10] Defendants contend that the officers conducted multiple searches. The Government contends that although the officers were "in and out" of the Corolla multiple times, it constituted one continuous search.

passengers in the Corolla. When Defendant Hassell answered in the affirmative, Officer Roberts instructed him to return to the Corolla and get the other passengers out of the car. Defendant Hassell testified that after he did so, he turned around to see that Officer Roberts had stepped out of his vehicle and drawn his firearm. Officer Roberts then told the three Defendants to get on the ground. Other police officers arrived on the scene shortly thereafter and the three Defendants were handcuffed. Officer Osorio handcuffed Defendant Hassell. The three Defendants remained handcuffed on the ground for over forty minutes. The officers conducted multiple searches of the vehicle and did not find "anything" until the end of the search when they removed panels in the Corolla. Defendant Hassell testified that he did not provide consent to any officer to search the Corolla.

## II. DISCUSSION

### A.     Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches without a warrant are presumptively unreasonable." *United States v. Mathurin*, 561 F.3d 170, 173 (3d Cir. 2009). "However, under the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" *Id.* at 173–74 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Such brief investigative stops are "seizures" subject to Fourth Amendment protection. *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (citing *Terry*, 392 U.S. at 21). Any evidence obtained as a result of an unconstitutional seizure "must be suppressed as 'fruit of the

poisonous tree.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

The reasonable suspicion necessary for a *Terry* stop "is a less demanding standard than probable cause[.]" *Alabama v. White,* 496 U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is somewhat lower and can be established with information that is different in quantity or content than that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (quoting *White*, 496 U.S. at 330, and citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). The police officer must, however, demonstrate that the stop was based on something more than an "'inchoate and unparticularized suspicion or hunch.'" *Sokolow,* 490 U.S. at 7 (quoting *Terry,* 392 U.S. at 27). An officer, therefore, "may only effectuate a *Terry* stop where 'specific and articulable facts, together with all their rational inferences, suggest that the suspect was involved in criminal activity.'" *Ramos*, 443 F.3d at 308 (quoting *United States v. Robertson,* 305 F.3d 164, 168 (3d Cir. 2002)).

In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). What is constitutionally "unreasonable" varies with the circumstances, and requires a balancing of the "nature and extent of the governmental interests" that justify the seizure, against the "nature and quality of the intrusion on individual rights" that the seizure imposes. *Terry,* 392 U.S. at 22, 24. In judging the reasonableness of stops, courts examine whether "the facts available to the officer at the moment of the seizure . . . 'warrant a man of reasonable caution in the belief'" that "criminal activity may be afoot." *Id.* at 21–22, 30 (citations omitted).

The constitutionality of a *Terry* stop involves a two-part assessment:

> First, we examine 'whether the officer's action was justified at its inception'—that is, whether the stop was supported by reasonable suspicion at the outset. . . . Next, we determine whether the manner in which the stop was conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'

*United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19–20). In considering whether a stop is "'so minimally intrusive as to be justifiable on reasonable suspicion,'" courts consider the duration of the stop; the law enforcement purposes justifying the stop; whether the police diligently sought to carry out those purposes given the circumstances; and alternative means by which the police could have served their purposes. *United States v. Sharpe,* 470 U.S. 675, 684–87 (1985) (citation omitted).

**B.   Analysis**

   **1.   The Stop**

Defendants argue that the stop violated their constitutional rights because "[a]bsent an observation by the Officer of a traffic or regulatory violation, a traffic stop is unreasonable under the Fourth Amendment" (Dkt. No. 18 at 5),[11] and Officer Roberts did not identify a traffic violation that caused him to stop the Corolla (*id.* at 4–5; Dkt. No. 24 at 2–3). Additionally, Defendants argue that Officer Roberts stopped the Corolla in an area "nowhere near" Marshall Command, where the car was allegedly seen. (Dkt. No. 18 at 4; Dkt. No. 24 at 3). Defendants

---

[11] *See* Dkt. No. 18 at 4 ("[I]t must be noted that while pretextual stops supported by reasonable suspicion do not run afoul of the Fourth Amendment, such pretextual traffic stops require the officer to have actually observed the traffic violation prior to initiating the traffic stop."); Dkt. No. 24 at 2 ("The threshold issue in determining the constitutionality of the traffic stop depends on whether, at the time of the stop, the officer reasonably believed that Defendant Hassell was committing a 'traffic offense,' and whether the law authorized a stop for such offense.") (citing *Johnson*, 63 F.3d 242). At the suppression hearing, counsel for Defendant Hassell further confirmed that Defendants' position is that an officer cannot conduct a *Terry* stop of a car without witnessing it commit a traffic violation, even in a case—as here—where the car has been reported in connection with a crime. As discussed below, this is plainly wrong.

further assert that none of the alleged Cool Out Bar victims provided the license plate number of the Corolla (Dkt. No. 18 at 4), and there are "many silver Toyota Corollas on the island of St. Croix" (*Id.*; Dkt. No. 24 at 3).

In opposition, the Government argues that, based on the totality of the circumstances, Officer Roberts had reasonable suspicion to stop Defendants' vehicle. (Dkt. No. 23). Specifically, the Government points to the two sets of victims' descriptions of the silver Corolla and chrome gas tank cover; one of the Cool Out Bar victims notifying police that the Corolla drove past Marshall Command; and Officer Roberts' sighting of a car that matched the victims' descriptions. (*Id.*).

As a preliminary matter, Defendants misread the law in arguing that the Corolla could not be stopped by the police in the absence of a traffic violation. "[T]he Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)). However, where an officer has "reasonable, articulable suspicion that criminal activity is afoot," *Ramos*, 443 F.3d at 308, the officer needs no traffic violation or other pretext to stop the car in question. Accordingly, because Officer Roberts had the necessary reasonable suspicion to justify a *Terry* stop of the Corolla, the existence or non-existence of a traffic violation is irrelevant.

In reaching the conclusion that a justifiable *Terry* stop occurred, the Court begins by noting that the police dispatcher received, and communicated over the radio, an initial police report from the Cool Out Bar victims describing a silver Toyota Corolla with a chrome gas tank cover, as well as a second report that one of the Cool Out Bar victims observed the vehicle in question driving west past Marshall Command. The Third Circuit has stated that "where the tip .

. . . itself [is] reliable, it could itself be the basis of the reasonable suspicion . . . ." *Nelson*, 284 F.3d at 478 (citing *Adams v. Williams*, 407 U.S. 143 (1972)). A police report is more reliable than a "tip," and will generally provide reasonable suspicion "when the victim of a street crime seeks immediate police aid and gives a description of his assailant . . . ." *See Adams*, 407 U.S. at 147.

In *United States v. Nelson*, the description reported to the police—by an anonymous informant—and dispatched over the radio was a "gray BMW with a tag in the back window and two black males inside." 284 F.3d at 481. There was no dispute in *Nelson* that the vehicle pulled over "matched precisely the broadcast information." *Id.* Additionally, the BMW stopped was on the road described in the first broadcast. The Third Circuit found that "[b]ecause the officers stopping the car did so based on the fact that the car and individuals matched the description broadcast over the police radio, the reasonableness of the stop . . . depend[ed] on the reliability of the tip itself." *Id.*

Here, there was not simply a "tip," but rather an initial police report from the Cool Out Bar victims, made immediately following the alleged robbery, as well as a report that one of the Cool Out Bar victims observed the silver Corolla driving west past Marshall Command.[12] As noted, these types of reports, filed by victims of street crime who immediately seek police assistance and provide descriptions of their assailants, are generally reliable. *See Adams*, 407 U.S. at 147. Accordingly, because the reports giving rise to the broadcasts were reliable, the

---

[12] As noted above, around the time that one of the Cool Out Bar victims reported seeing the Corolla drive past Marshall Command, two individuals arrived at Marshall Command and reported that they had been robbed on Hospital Street by three black males driving a silver Toyota Corolla. It is unclear from the record whether this report was included in the broadcast that Officer Roberts heard before stopping Defendants. Accordingly, the Court will not consider the Hospital Street victims' report in its analysis of whether Officer Roberts had reasonable suspicion for the *Terry* stop.

Court must assess how closely the Corolla "matched" the broadcast information. *See Nelson*, 284 F.3d at 481.

Officer Roberts testified that he heard a call over the radio stating that a "silverish/goldish" Toyota Corolla with a chrome gas tank cover—which was suspected in an armed robbery—had passed Marshall Command heading west. He further testified that approximately two to five minutes later, he observed a car that matched the description traveling west in an area located to the west of Marshall Command. Defendants assert in their Motions that Officer Roberts did not have reasonable suspicion to stop the vehicle because it was "nowhere near the area of VIPD Marshall Command"; the license plate number was not known to Officer Roberts;[13] and there are "many silver Toyota Corollas on the island of St. Croix." (Dkt. No. 18 at 4; Dkt. No. 24 at 3).

The Court notes that "officers can consider the time and area . . . in determining whether suspicion is reasonable." *Nelson*, 284 F.3d at 481 (citing *United States v. Valentine*, 232 F.3d 350, 356–57 (3d Cir. 2000)); *see also United States v. Mancilla*, 481 F. App'x 350, 351 (9th Cir. 2012) ("It was reasonable for the district court to infer that, in a small rural town like Sunnyside, Washington, it is unlikely that officers would see more than a few vehicles in reasonable proximity to the predicted area of travel at 1:00 a.m., and even less likely that there would be more than one vehicle that matched the reporting party's description."); *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003) (finding reasonable suspicion where police stopped a driver who matched the racial description of the suspect in a vehicle that was "substantially

---

[13] There is a dispute as to whether Officer Roberts knew the Corolla's license plate number before stopping the car. Without resolving this issue, the Court will evaluate whether Officer Roberts had reasonable suspicion based on the uncontroverted facts at his disposal—the make, model, and color of the car (a "silverish/goldish" Toyota Corolla); the chrome gas tank cover; the report that the Corolla passed Marshall Command heading west; and Officer Roberts' sighting of a silver Corolla with a chrome gas tank cover in an area to the west of Marshall Command.

similar" to the description provided—"a purple SUV with shiny rims"—minutes after the crime occurred and eight blocks away); *United States v. Jones*, 187 F.3d 210, 216–17 (1st Cir. 1999) (finding reasonable suspicion where defendants who matched the racial description of the suspects were stopped driving a white Lexus in the vicinity of where the police expected to find them based on a witness's report, and the suspect's vehicle had been described as "a white or light colored late-model car, possibly a Buick or Oldsmobile."); *United States v. Parker*, 2010 U.S. Dist. LEXIS 118735, at *18–22 (E.D. Pa. Nov. 5, 2010) (finding reasonable an investigatory stopped based, in part, "on [the officers'] knowledge of the make and color of a vehicle, driving in an area with a reputation for mid-level crime, at an hour where any other traffic was minimal," "in the immediate vicinity of the reported criminal activity.").

Although Defendants argue that there are "many silver Toyota Corollas on the island of St. Croix," (Dkt. No. 18 at 4; Dkt. No. 24 at 3), they neglect to "consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8. This was not simply a case of an officer stopping a silver Toyota Corolla. It was an officer stopping: (1) a silver Toyota Corolla; (2) with a chrome gas tank cover; (3) on the road at 2:00 a.m. on the island of St. Croix; (4) traveling in a direction consistent with its last sighting by a victim of the robbery; and (5) matching the description broadcast over the police radio from victims of an armed robbery.

Specifically, Officer Roberts observed Defendants' vehicle at approximately 2:00 a.m. driving in the direction the suspected vehicle was headed when it was last seen. Defendants' vehicle was the same make, model, and color as was broadcast, and had the same distinctive chrome gas tank cover. Based on the totality of the circumstances—the Cool Out Bar victims' police report, the report that the Corolla had passed Marshall Command heading west, and Officer Roberts' sighting of a car that matched the victims' description—the Court finds that

Officer Roberts had a "reasonable, articulable suspicion that criminal activity [was] afoot." *Ramos*, 443 F.3d at 308 (citing *Terry*, 392 U.S. at 27). Accordingly, the stop of Defendants' Corolla did not contravene the Fourth Amendment.

### 2. The Search

Defendants contest the facts presented by the Government at the suppression hearing regarding the search. Most notably, Defendants contend that neither Defendant Hassell nor Defendant Hendrickson gave any officer consent to search the Corolla. (Dkt. No. 18 at 5; Dkt. No. 24 at 4)).

Given the conflicting narratives advanced by both parties through their filings, and the evidence and argument presented at the evidentiary hearing, the Court is required to make credibility determinations. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) ("[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.") (citations and internal quotation marks omitted). Based on the totality of the evidence presented, including the relative plausibility of the competing accounts, the Court credits the account provided by the Government on the salient points.

The Court finds Defendant Hassell's testimony generally unworthy of belief. The Court finds implausible and not credible Defendant Hassell's statement that Officer Roberts called Defendant Hassell over to Roberts' vehicle, while remaining seated inside his vehicle. It is uncontroverted that Officer Roberts was responding to calls over the police radio indicating that the individuals in the Corolla were involved in an armed robbery. The Court finds it unlikely that Officer Roberts would remain seated in his vehicle without his firearm drawn for protection,

while directing a suspect he believed to be armed and dangerous to approach him with the suspect's license and registration. Nor does the Court credit Defendant Hassell's testimony that he did not consent to the search.

In contrast, the Court finds the Government's version of the facts on salient points, as testified to by Officers Roberts and Osorio and Deputy Chief Hector, to be plausible and credible. Although there were some inconsistencies in the testimony of the Government witnesses with regard to some of the facts,[14] the key aspects of the three Government witnesses' respective testimony presented a cohesive and plausible explanation of the events that transpired. Deputy Chief Hector corroborated Officer Roberts' testimony that he exited the vehicle and stood behind his door with his firearm drawn because he feared for his life, believing Defendants to be armed and dangerous. Deputy Chief Hector also corroborated Officer Roberts' testimony that Defendant Hassell consented to the search. Further, all three Government witnesses testified to smelling marijuana coming from the Corolla, and Officers Roberts and Osorio testified to smelling marijuana on defendant Hassell's person.

A warrantless search conducted with a suspect's consent does not violate the suspect's Fourth Amendment rights—even if the officer does not have probable cause. *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1972)). A suspect's consent must be voluntarily given. *Id.* (citing *Bumper v. N. Carolina*, 391 U.S. 543, 548 (1968)); *see also Schneckloth*, 412 U.S. at 233 ("[I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable.") (citations omitted).

---

[14] The inconsistencies involved testimony regarding which officers handcuffed Defendants; who ordered Defendants to the ground; and whether Officer Osorio participated in the search.

Based on the evidence presented and the Court's credibility determinations, the Court finds that Defendant Hassell consented to the search of the Corolla. Further, there is no indication that Defendant Hassell's consent was coerced. The evidence before the Court is that Officer Roberts—after informing Defendant Hassell that he smelled a strong odor of marijuana coming from Hassell's person and the Corolla—asked Defendant Hassell "if he minds if I search the vehicle," to which Hassell replied, "no." Thus, the Court finds that the consent was voluntarily given. Accordingly, the search was lawfully conducted without a warrant, and no probable cause was needed.

Even assuming that the Court credits Defendant Hassell's testimony that he did not give consent to search the vehicle, the Court still finds that the search was constitutional because Officer Roberts' reasonable suspicion ripened into probable cause to search the Corolla. *See United States v. Lyons*, 687 F.3d 754, 764 (6th Cir. 2012) ("Reasonable suspicion supporting a traffic stop may ripen into probable cause to search a vehicle based on the officer's interactions with the car's occupants.") (citation omitted). All three government witnesses testified that they smelled marijuana coming from the Corolla, and Officers Roberts and Osorio testified that they smelled marijuana coming from Defendant Hassell's person. The marijuana odor they detected provided probable cause to search the car. *See Ramos*, 443 F.3d at 308 ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause."); *see also United States v. Ushery*, 400 F. App'x 674, 675 (3d Cir. 2010) (holding that probable cause supported the search of the defendant's car when police officers smelled the odor of marijuana coming from inside the car).

With the existence of probable cause, the officers were permitted to search the entire vehicle. *See United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the

search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *United States v. Cole*, 2010 WL 724382 at *3 (D.V.I. Mar. 1, 2010) ("Once probable cause to search the car existed, it provided the basis for searching the entire vehicle."). A search of a vehicle for narcotics supported by probable cause—as here—could lawfully include actions such as removing an air vent, the glove compartment, the radio, and door panels. *See Cal. v. Acevedo*, 500 U.S. 565, 579–80 (1982) ("'The scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that it may be found.'") (quoting *Ross*, 456 U.S. at 824); *see also United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013) (noting that "every part of a vehicle which may conceal the object of the search may be searched when the search is supported by probable cause" and holding that "the existence of probable cause to believe the vehicle contained crack cocaine permitted officers to remove a piece of the dashboard" during the search) (internal citation and quotation marks omitted); *United States v. Harwood*, 998 F.2d 91, 97 (2d Cir. 1993) (holding that where there was probable cause to believe that the suspect had LSD in his van, "the search of the van's door panels was permissible" given that "LSD in blotter form may be stashed anywhere in a vehicle[.]").

Accordingly, the Court finds that the search of the Corolla was constitutionally permissible because Defendant Hassell gave his consent. Even if there was no consent to search, the Court finds that the search did not violate Defendants' Fourth Amendment rights because Officer Roberts' reasonable suspicion had ripened into probable cause.

### III.  CONCLUSION

For the foregoing reasons, the Court finds that the *Terry* stop, the search of the Corolla and the seizure of the evidence were constitutionally permissible.

Accordingly, it is hereby

**ORDERED** that Defendants Motions to Suppress (Dkt. Nos. 17, 24) are **DENIED.**

**SO ORDERED.**

Date:  February 5, 2014 _____/s/_____
WILMA A. LEWIS
Chief Judge